Slip Op. 18–163

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FINE FURNITURE (SHANGHAI) LIMITED, ET AL., | : |
| | : |
| Plaintiffs, | : |
| | : |
| and | : |
| | : |
| ARMSTRONG WOOD PRODUCTS (KUNSHAN) CO., LTD., GUANGDONG YIHUA TIMBER INDUSTRY CO., LTD., OLD MASTER PRODUCTS, INC., LUMBER LIQUIDATORS SERVICES, LLC, SHANGHAI LAIRUNDE WOOD CO., LTD., CHANGZHOU HAWD FLOORING CO., LTD., DALIAN HUILONG WOODEN PRODUCTS CO., LTD., DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD., DUNHUA CITY DEXIN WOOD INDUSTRY CO., LTD., DUNHUA CITY HONGYUAN WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., KARLY WOOD PRODUCT LIMITED, YINGYI-NATURE (KUNSHAN) WOOD INDUSTRY CO., LTD., XIAMEN YUNG DE ORNAMENT CO., LTD., ZHEJIANG SHUIMOJIANGNAN NEW MATERIAL TECHNOLOGY CO., LTD., | : |
| | : |
| Plaintiff-Intervenors, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

Before: Richard K. Eaton, Judge

Consol. Court No. 16-00145

## **OPINION**

[United States Department of Commerce's Final Results are sustained.]

Dated:   November 26, 2018

*Sarah M. Wyss*, Mowry & Grimson, PLLC, of Washington DC, argued for plaintiff. With her on the brief were *Kristin H. Mowry*, *Jeffrey S. Grimson*, *Jill A. Cramer*, *Yuzhe PengLing*, and *James C. Beaty*.

*Gregory S. Menegaz*, *J. Kevin Horgan*, *Alexandra H. Salzman*, and *Judith L. Holdsworth*, of deKieffer & Horgan, PLLC, of Washington DC, for consolidated plaintiffs Changzhou Hawd Flooring Co., Ltd., Dalian Huilong Wooden Products Co. Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Dunhua City Hongyuan Wood Industry Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Karly Wood Product Limited, Yingyi-Nature (Kunshan) Wood Industry Co., Ltd., Xiamen Yung De Ornament Co., Ltd., and Zhejiang Shuimojiangnan New Material Technology Co., Ltd.

*Lizbeth R. Levinson*, *Ronald M. Wisla* and *Brittney R. McClain*, Kutak Rock LLP, of Washington DC, for consolidated plaintiffs Zhejiang Dadongwu GreenHome Wood Co., Ltd., Johnson's Premium Hardwood Flooring, Inc., Struxtur, Inc., Wego Chemical & Mineral Corp., Floor and Décor Outlets of America, Inc., Hangzhou Hanje Tec Co., Ltd., Huzhou Chenghang Wood Co., Ltd., Jilin Forest Industry Jinqiao Flooring Group Co., Ltd., MuDanJiang Bosen Wood Industry Co., Ltd., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Shenyang Haobainian Wooden Co., Ltd., Dalian Dajen Wood Co., Ltd., and Dunhua City Wanrong Wood Industry Co., Ltd.

*Francis J. Sailer* and *Andrew T. Schutz*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington DC, for plaintiff-intervenor Shanghai Lairunde Wood Co., Ltd.

*John R. Magnus* and *Sheridan S. McKinney*, TradeWins LLC, of Washington DC, for plaintiff-intervenor Old Master Products, Inc.

*H. Deen Kaplan* and *Craig A. Lewis*, Hogan Lovells US LLP, of Washington, DC, for plaintiff-intervenor Armstrong Wood Products (Kunshan) Co. Ltd.

*Mark Ludwikowski*, *Kristen Smith*, *Arthur K. Purcell*, and *Emi Ito Ortiz*, Sandler, Travis & Rosenberg, P.A., of Washington DC, for plaintiff-intervenor Lumber Liquidators Services, LLC.

*Jonathan M. Zielinski* and *Thomas M. Beline*, Cassidy Levy Kent (USA) LLP, of Washington DC, for plaintiff-intervenor Guangdong Yihua Timber Industry Co., Ltd.

*Tara K. Hogan*, Senior Trial Counsel, U.S. Department of Justice, Commercial Litigation Branch, of Washington DC, argued for defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of Counsel on the brief was *Mercedes C. Morno*, Office of Trade Enforcement & Compliance, U.S. Department of Commerce.

Eaton, Judge: In this consolidated action, plaintiff Fine Furniture (Shanghai) Limited ("Fine Furniture" or "plaintiff") moves for judgment on the agency record, challenging the United States Department of Commerce's ("Commerce" or "Department") final results in the third administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China. *See Multilayered Wood Flooring From the People's Rep. of China*, 81 Fed. Reg. 46,899 (Dep't Commerce July 19, 2016), *as amended* 81 Fed. Reg. 53,120 (Dep't Commerce Aug. 11, 2016) ("Final Results"); *see also* Final Issues & Dec. Mem. (July 12, 2016) ("Final IDM") (P.R. 359-361). Fine Furniture, consolidated plaintiffs,[1] and plaintiff-intervenors[2] (collectively, "plaintiffs") contend that Commerce's Final Results were unsupported by substantial evidence on the record. *See* Fine Furniture's Mem. Supp. Mot. J. Agency R., ECF No. 90-1 ("Fine Furniture Br.").

Plaintiffs are producers and/or exporters of multilayered wood flooring from China. By their motions for judgment on the agency record, plaintiff and plaintiff-intervenors challenge Commerce's (1) selection of Romania as the primary surrogate country, (2) calculation of the

---

[1]     The consolidated plaintiffs are Zhejiang Dadongwu GreenHome Wood Co., Ltd., Johnson's Premium Hardwood Flooring, Inc., Struxtur, Inc., Wego Chemical & Mineral Corp., Floor and Décor Outlets of America, Inc., Hangzhou Hanje Tec Co., Ltd., Huzhou Chenghang Wood Co., Ltd., Jilin Forest Industry Jinqiao Flooring Group Co., Ltd., MuDanJiang Bosen Wood Industry Co., Ltd., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Shenyang Haobainian Wooden Co., Ltd., Dalian Dajen Wood Co., Ltd., and Dunhua City Wanrong Wood Industry Co., Ltd.

[2]     The plaintiff-intervenors are Armstrong Wood Products (Kunshan) Co., Ltd.; Guangdong Yihua Timber Industry Co., Ltd.; Old Master Products Inc. ("Old Master"); Lumber Liquidators Services, LLC; Shanghai Lairunde Wood Co., Ltd. ("Shanghai Lairunde"); and consolidated plaintiffs Changzhou Hawd Flooring Co., Ltd., Dalian Huilong Wooden Products Co. Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Dunhua City Hongyuan Wood Industry Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Karly Wood Product Limited, Yingyi-Nature (Kunshan) Wood Industry Co., Ltd., Xiamen Yung De Ornament Co., Ltd., and Zhejiang Shuimojiangnan New Material Technology Co., Ltd. ("Changzhou Hawd plaintiffs").

surrogate financial ratios, and (3) calculation of the surrogate value for Fine Furniture's face veneer. *See generally* Fine Furniture Br.[3] Plaintiff-Intervenor Old Master also challenges Commerce's (4) calculation of the antidumping duty margin assigned to the separate rate companies who were not selected for individual examination. *See* Old Master's Mem. Supp. Mot. J. Agency R., ECF No. 92-1 ("Old Master Br.").[4]

Defendant the United States, on behalf of Commerce, maintains that the Final Results should be sustained because they are in accordance with law and supported by substantial evidence. *See* Def.'s Resp. Opp'n Mots. J. Admin. R., ECF No. 101 ("Def.'s Br.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2012). For the reasons stated below, the court sustains Commerce's Final Results.

## BACKGROUND

On October 18, 2011, Commerce published its final affirmative dumping determination and an antidumping duty order on multilayered wood flooring from China. *See Multilayered Wood Flooring From the People's Rep. of China*, 76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011). The order was amended twice and remains in effect. *See Multilayered Wood Flooring From the People's Rep. of China*, 76 Fed. Reg. 76,690 (Dep't Commerce Dec. 8, 2011) (amended final dumping determination and order); *Multilayered Wood Flooring From the People's Rep. of China*,

---

[3]     The plaintiff-intervenors incorporate by reference the surrogate country and surrogate value arguments made by plaintiff Fine Furniture. Accordingly, the court will generally refer to Fine Furniture's papers. Any arguments not specifically addressed in Fine Furniture's papers will be expressly noted.

[4]     The plaintiff-intervenors incorporate by reference the separate rate assessment arguments made by plaintiff-intervenor Old Master. Accordingly, citations to this argument will be made by reference to the motion filed by Old Master. Any argument on this matter not specifically addressed in Old Master's papers shall be expressly noted.

77 Fed. Reg. 5484 (Dep't Commerce Feb. 3, 2012) (amended antidumping and countervailing duty orders).

On February 4, 2015, Commerce initiated its third administrative review of the order covering the period of December 1, 2013, through November 30, 2014 ("POR"). *See* Initiation of Antidumping and Countervailing Duty Admin. Reviews, 80 Fed. Reg. 6041 (Dep't Commerce Feb. 4, 2015). Fine Furniture and Dalian Penghong Floor Products Co., Ltd. ("Penghong") were selected as mandatory respondents. *See Final Results*, 81 Fed. Reg. at 46,899. Because China is considered a nonmarket economy, Commerce was required to select a surrogate market economy country to value the factors of production of the subject imports.[5]

As part of its review, on May 15, 2015, Commerce's Import Administration Office of Policy issued a non-exhaustive list of countries at the same or comparable level of economic development as China based on per capita gross national income as reported in the World Bank's 2015 Development Report (the "OP list"). This list included Romania, Bulgaria, South Africa,

---

[5]     In antidumping proceedings involving nonmarket economy countries—such as China—19 U.S.C. § 1677b(c)(1) requires Commerce to calculate the normal value of the subject merchandise based on surrogate values offered in a comparable market economy country, *i.e.*, a surrogate country. Subsection 1677b(c)(1) provides:

> [If] (A) the subject merchandise is exported from a nonmarket economy country, and (B) . . . available information does not permit the normal value of the subject merchandise to be determined . . . , the normal value of the subject merchandise [shall be determined] on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate . . . .

19 U.S.C. § 1677b(c)(1). Subsection 1677b(c)(4) requires commerce to use the prices or costs of factors of production in "one or more market economy countries" that are "(A) at a level of economic development comparable to that of the nonmarket economy country" and "(B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)-(B).

Ecuador, Thailand, and Ukraine.[6] Commerce then set a deadline of June 15, 2015, for comments on surrogate country selection regarding the listed countries' (1) significant production of comparable merchandise, (2) data availability and quality, to value factors of production, and (3) financial statements availability and quality (*i.e.*, whether the countries were acceptable as surrogate countries or to propose other economically comparable countries); and a deadline of June 29, 2015, to submit proposed surrogate values.[7] *See* Letter to All Interested Parties Re: Request for Surrogate Country and Surrogate Value Comments and Information (May 15, 2015) (P.R. 169).

In its initial response, filed on June 15, 2015, petitioner Coalition for American Hardwood

---

[6]    Commerce selects a primary surrogate country using a process that tracks the requirements of 19 U.S.C. § 1677b(c)(1) and (4), described above. The Department's practice in identifying countries that are at the same level of economic development is described in the Department's Policy Bulletin No. 04.1. *See* Import Admin., U.S. Dep't Commerce, *Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004) ("Policy Bulletin 04.1"), *available at* http://enforcement.trade.gov/policy/bull04-1.html (last visited Nov. 20, 2018). As an initial matter,

> [t]he operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the [nonmarket economy] country. OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).

Policy Bulletin 04.1 at 2.

[7]    The Department states that it will generally select

> a surrogate country that is at the same level of economic development as the [nonmarket economy] unless it is determined that none of the countries are viable options because (a) they . . . are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available [surrogate value] data, or (c) are not suitable for use based on other reasons.

Selection of a Surrogate Country Mem. (Dec. 31, 2015) (P.R. 294) at 4.

Parity ("petitioner")[8] stated that the six potential surrogate countries on Commerce's OP list were (1) significant producers of comparable merchandise and (2) that data of reasonable availability and quality, for the factors of production, and financial statements were available (*i.e.*, that all six countries met the requirements for use as the primary surrogate country), but because "one of the mandatory respondents [Fine Furniture] . . . was not due for submission to the Department until June 12, 2016," and therefore petitioner "d[id] not know the specific factors of production for that respondent," petitioner did not make any arguments as to which country was the most appropriate surrogate country. *See* Pet. Comments on Surrogate Selection (P.R. 185) at 3. In fact, on June 15, 2015, Fine Furniture timely submitted a letter arguing that Thailand should serve as the surrogate country. *See* Fine Furniture's Surrogate Country Comments (June 15, 2015) (P.R. 186) at 2.

Thereafter, on June 29, 2015, petitioner submitted proposed surrogate values from Romania and, for the first time, argued that Romania was the most appropriate surrogate country. *See* Letter from Levin Trade Law, P.C. to Commerce (June 26, 2015) (P.R. 190-192). On November 20, 2015, Commerce rejected a portion of this submission because it contained "untimely filed comments on surrogate country selection" (which were due by June 15, 2015), but allowed petitioner to resubmit the document without those comments. *See* Letter from Commerce to Levin Trade Law, P.C. (Nov. 20, 2015) (P.R. 279). Petitioner resubmitted the document with the necessary adjustments on November 24, 2015. *See* Letter from Levin Trade Law, P.C. to Commerce (Nov. 24, 2015) (P.R. 281-282).

Also, on November 2, 2015, petitioner submitted additional proposed surrogate values and commented that "these suggestions demonstrate the superiority of Romania as a surrogate country versus Thailand." Letter from Levin Trade Law, P.C. to Commerce (Nov. 2, 2015) (P.R. 254) at 2.

---

[8]      Petitioner is not a party to this action or any of the consolidated cases.

On November 5, 2015, Commerce held an *ex parte* meeting with petitioner regarding the selection of the appropriate surrogate country. *See* Memo to File Re: Ex Parte Meeting (Nov. 5, 2015) (P.R. 268). At the *ex parte* meeting, petitioner presented a data spreadsheet titled "Comparison of Surrogate Values for Key Inputs," with one column titled "Why Romanian [Surrogate Value] is better." Letter from Levin Trade Law, P.C. to Commerce (Nov. 6, 2015) (P.R. 269); *see also* Meeting Handout (P.R. 270).

On January 8, 2016, Commerce published its preliminary results. *See Multilayered Wood Flooring From the People's Rep. of China*, 81 Fed. Reg. 903 (Dep't Commerce Jan. 8, 2016) ("Preliminary Results"), and accompanying Prelim. Dec. Mem. (Dec. 31, 2015) (P.R. 292-293) ("Preliminary Decision Mem."). In the Preliminary Results, Commerce found that "Bulgaria, Romania, Ecuador, Ukraine, South Africa, and Thailand [were] all at the same level of economic development as [China]" and were "all significant producers of comparable merchandise." Preliminary Decision Mem. at 10-11.

In the Preliminary Results, Commerce selected Romania as the primary surrogate country based, on what it said, was the "availability and reliability" of the surrogate value data. *See* Preliminary Decision Mem. at 11. Although Commerce stated that "the record of this review contains specific, contemporaneous, and high-quality data from Thailand and Romania to value all [factors of production]," it found that "Romania contains the best available information for valuing respondents' [factors of production]" because "the import data from Romania contains greater specificity for certain major inputs (*i.e.*, logs and lumber)." Selection of a Surrogate Country Mem. (Dec. 31, 2015) (P.R. 294) ("Surrogate Country Mem.") at 7. Specifically, Commerce found that "the Romanian HTS schedule contains categories specific to [the] wood species and thicknesses reported by the mandatory respondents," whereas "the Thai HTS schedule

does not contain species-specific categories." Surrogate Country Mem. at 7. Moreover, Commerce preliminarily found that because "the record lacks a contemporaneous labor [surrogate value] from Thailand," and that the "Romanian labor rates are contemporaneous with the POR," there was further support for a finding that Romania was the more appropriate surrogate country. Surrogate Country Mem. at 7. Also, Fine Furniture's arguments to the contrary notwithstanding, Commerce preliminarily determined that "both [Romania and Thailand] provide equally specific data on non-wood raw materials, such as [surrogate values] for glue, thinner, and other chemicals." Surrogate Country Mem. at 7.

Next, the record contained surrogate financial statements from Romania and Thailand.[9] Specifically, usable financial statements came from three producers: Neotech Plywood Co., Ltd ("Neotech") and Lampang Product Ordinary Partnership ("Lampang"), of Thailand; and SC Sigstrat SA ("Sigstrat"), of Romania. *See* Preliminary Decision Mem. at 21-22. Commerce then found that, although the financial statements of Romanian company Sigstrat, and Thai companies Neotech, and Lampang were all "useable[,] . . . contemporaneous financial statements of producers of comparable merchandise, contain no evidence of countervailable subsidies, and contain no qualified opinions," the financial statement for Romanian producer Sigstrat contained the best available information. *See* Preliminary Decision Mem. at 22. Commerce stated that this decision was, among other things, in accordance with its longstanding preference of valuing all factors of production in a single surrogate country (with the exception of labor). Preliminary Decision Mem. at 22. Using Romanian data to value all of the factors of production, Commerce preliminarily assigned weighted-average dumping margins[10] of 13.34 percent and 0.00 percent for Fine

---

[9]        Commerce uses surrogate financial statements to derive the financial ratio.

[10]       "The term 'weighted average dumping margin' is the percentage determined by

Furniture and Penghong, respectively.[11] *See* Preliminary Results, 81 Fed. Reg. at 905.

Subsequently, Fine Furniture, Penghong, Shanghai Lairunde, Lumber Liquidators, the Changzhou Hawd plaintiffs, and some of the consolidated-plaintiffs submitted comments on Commerce's Preliminary Results. *See* Final Results, 81 Fed. Reg. at 46,900; *see also* Letter from Fine Furniture to Commerce Re: Case Brief for Consideration Prior to the Final Results (Feb. 12, 2016) (P.R. 340) ("Fine Furniture Case Br."). Based on a review of the record and the comments received, Commerce made certain revisions to its margin calculations for Fine Furniture and the separate rate respondents not selected for individual examination. *See* Final Results, 81 Fed Reg. at 46,901.

On July 19, 2016, Commerce issued the Final Results in which Commerce continued to find Romania to be "the most appropriate surrogate country." Final IDM at 10. Commerce then assigned weighted-average dumping rates of 17.37 percent and 0.00 percent to Fine Furniture and Penghong, respectively. *See* Final Results, 81 Fed Reg. at 46,901. In calculating the separate rate, Commerce excluded from averaging the 0.00 percent rate calculated for Penghong, resulting in a 17.37 percent rate for the separate rate respondents. *See* Final Results, 81 Fed Reg. at 46,901; *see*

---

dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B).

[11]     Commerce determined that twenty of the plaintiffs in this case were entitled to separate rates. *See* Preliminary Results, 81 Fed. Reg. at 904-05. Because Commerce calculated a 0.00 percent margin for Penghong, this rate was excluded from the average in the determination of the separate rate margin. Accordingly, Commerce preliminarily assigned to each separate rate company a margin of 13.34 percent based on the weighted-average of the weighted-average dumping margin calculated for Fine Furniture. Preliminary Results, 81 Fed. Reg. at 905. The rate was amended upward in the Final Results as a result of Fine Furniture's rate being adjusted to 17.37 percent. *See* Final Results, 81 Fed. Reg. at 46,901.

19 U.S.C. § 1673d(c)(5)(A).[12]

The rate changes resulted from three adjustments to the calculations of the factors of production valuations used by Commerce in the Preliminary Results. *See* Multilayered Wood Flooring from the People's Rep. of China: Final Surrogate Value Mem. (July 12, 2016) (P.R. 364) ("Final Surrogate Value Mem."). Consistent with the Preliminary Results, Commerce retained Romania as the primary surrogate country for calculating the factors of production. *See* Final IDM at 10, 23. First, Commerce revised Fine Furniture's surrogate values for certain lumber raw materials, including white and European oak, tigerwood lumber, and jatoba lumber, and also corrected an error in the valuation of sapelli lumber. *See* Final Surrogate Value Mem. at 1. Second, Commerce revised its calculation of the surrogate financial ratios by relying on Note 4[13] of the Sigstrat financial statement "to calculate Fine Furniture's and [Penghong's] factory overhead, selling, general, and administrative expense, and profit ratios." Final Surrogate Value Mem. at 2.

---

[12]     In administrative reviews involving nonmarket economy countries, the statute is silent as to how Commerce establishes a rate for unselected respondents who establish their independence from the government (*i.e.*, the separate rate). *See, e.g., Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (Fed. Cir. 2013) (citation omitted) ("The separate rate for eligible non-mandatory respondents is generally calculated following the statutory method for determining the 'all others rate' under § 1673d(c)(5)(A)."). To fill the statutory gap, Commerce generally follows the method for determining the all-others rate in market economy investigations. *See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Rep. of China*, 80 Fed. Reg. 4244, 4245 (Dep't Commerce Jan. 27, 2015) (final results). Accordingly, Commerce looks to 19 U.S.C. § 1673d(c)(5)(A), which provides that

> the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.

19 U.S.C. § 1673d(c)(5)(A).

[13]     Note 4 of the Sigstrat financial statement details various expenses in 2013 and 2014. *See* Letter from Levin Trade Law, P.C. to Commerce Re: Petitioners' Comments Prior to Preliminary Results and Submission of Factual Information (Nov. 2, 2015) (P.R. 254-264), Ex. 4.

Third, Commerce also "revised the calculation of B&H [(brokerage and handling)] by deducting the cost of obtaining letters of credit, in the amount of $60.00, from the total cost of B&H reflected in the data." Final Surrogate Value Mem. at 2. Finally, to value the face veneer wood consumed by Fine Furniture, Commerce used a simple average of the value of imports into Romania under two HTS subheadings, which include a "Planed; sanded; end-jointed, whether or not planed or sanded" category and an "Other" category. *See* Final IDM at 23.

On September 1, 2016, Fine Furniture filed its complaint, seeking judicial review of Commerce's calculation of its antidumping duty rate in the Final Results. The plaintiff-intervenors subsequently filed their motions to intervene, which the court granted.

## STANDARD OF REVIEW

In reviewing Commerce's Final Results, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## LEGAL FRAMEWORK

"The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Clearon Corp. v. United States*, 37 CIT __, __, Slip Op. 13-22 at 4 (Feb. 20, 2013). In determining "whether [the] subject merchandise is being, or is likely to be, sold at less than fair value," the statute requires Commerce to make "a fair comparison . . . between the

export price[14] or constructed export price[15] and normal value.[16]"   19 U.S.C. § 1677b(a). When,

as here, the merchandise in question is exported from a nonmarket economy country,[17] "the

normal value of the subject merchandise [is based on] the value of the factors of production[18]

---

    [14]     The "export price" is

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c) of this section.

19 U.S.C. § 1677a(a).

    [15]     The "constructed export price" is

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d) of this section.

19 U.S.C. § 1677a(b).

    [16]     Generally, "normal value" is defined as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i).

    [17]     A nonmarket economy country is a "foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Because Commerce deems the PRC "to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

    [18]     Factors of production are "the factors of production utilized in producing merchandise [which] include, but are not limited to—(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and

utilized in producing the merchandise and [an] added . . . amount for general expenses and profit

plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B). To determine the

normal value of the subject merchandise in a nonmarket economy, Commerce must calculate

surrogate values using "the best available information regarding the values of such factors in a

[comparable] market economy." *Id*. In doing so, Commerce relies on one or more comparable

market economy countries that are (1) "at a level of economic development comparable to that of

the nonmarket economy country," and (2) "significant producers of comparable merchandise."[19]

*Id.* § 1677b(c)(4). In other words, Commerce's task is to "attempt to construct a hypothetical

market value" of the subject merchandise in the nonmarket economy. *Nation Ford Chem. Co. v.
United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

When Commerce finds that "there is more than one country that is at the same level of

economic development as the [nonmarket economy] country and is a significant producer of

comparable merchandise, [Commerce] will consider the quality and availability of the [surrogate

value] data." Surrogate Country Mem. at 6; *see also Fujian Lianfu Forestry Co. v. United States*,

33 CIT 1056, 1079, 638 F. Supp. 2d 1325, 1350 (2009) ("Data considerations may be a

determining factor for surrogate country selection."). In evaluating surrogate value data,

Commerce "considers several factors, including whether the [surrogate values] are publicly

---

(D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3). In valuing the factors of production, the statute further provides that Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

[19]      "Comparability is not defined in the antidumping statute or the regulation. Commerce's typical practice in analyzing comparability is to consider the similarities in production, end uses, and physical characteristics between two products." *Jiaxing Brother Fastener Co., Ltd. v. United States*, 34 CIT 1455, 1463-64, 751 F. Supp. 2d 1345, 1354 (2010).

available, contemporaneous with the POR, representative of a broad market average, tax and duty-exclusive, and specific to the inputs being valued." Surrogate Country Mem. at 6 (citing Policy Bulletin No. 04.1); *see also Qingdao Sealine Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (citing the same factors). Importantly, "[t]here is no hierarchy among these criteria, and [Commerce] must weigh available information with respect to each [factor of production] and make a product-specific and segment-specific decision as to what the best [surrogate value] is for each [factor of production]." Surrogate Country Mem. at 6-7; *see also Xiamen Int'l Trade and Indus. Co. v. United States*, 37 CIT __, __, 953 F. Supp. 2d 1307, 1313 (2013) ("Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case.").

Commerce's regulatory preference is to value all factors of production with surrogate values from a single surrogate country. 19 C.F.R. § 351.408(c)(2) (2016) ("Except for labor . . . , the Secretary normally will value all factors in a single surrogate country."). This preference has been approved by the Federal Circuit. *See Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1302 (Fed. Cir. 2016) ("[W]e find no error in Commerce's determination to use Thai import statistics to value HCl, a conclusion in accordance with its administrative preference to appraise surrogate values from a single surrogate country." (citing 19 C.F.R. § 351.408(c)(2)). After comparing the available data sets, "where there exist on the record 'alternative sources of data that would be equally or more reliable . . . it is within Commerce's discretion to use either set of data.'" *Zhejiang Native Produce & Animal By-Prods. Import & Export Grp. Corp. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1375, 1381 (2017) (quoting *Geum Poong Corp. v. United States*, 26 CIT 322, 326, 193 F. Supp. 2d 1363, 1369 (2002)); *Jiaxing Brother Fastener Co.*, 822 F.3d at 1302 (finding that because "[t]he record evidence shows that the HCl import statistics from

India and Thailand were equally usable, . . . Commerce's choice to use the Thai import statistics

is supported by substantial evidence.").


## DISCUSSION

I.   **Commerce's Selection of Romania over Thailand as the Surrogate Country Is Supported by Substantial Evidence and Is in Accordance with Law**

Plaintiff first argues that Commerce's selection of Romania, and not Thailand, as the

primary surrogate country was unsupported by substantial evidence and contrary to law. In

particular, plaintiff maintains that (1) "the decision was improperly grounded in the Petitioner's

untimely surrogate country comments," and (2) "Thailand provides the highest quality [surrogate

value] data under the factors examined by Commerce." Fine Furniture Br. 8.

A.   **Commerce Did Not Err in Accepting Defendant's November 2, 2015 and November 5, 2015 Submissions**

Initially, plaintiff argues that Commerce erred as a matter of law when it permitted

petitioner to submit comments supporting the selection of Romania as the surrogate country after

the June 15, 2015 deadline. *See* Fine Furniture Br. 8-12 (citing 19 C.F.R. § 351.302(d)[20]). In

particular, plaintiff maintains that "Commerce set a deadline of June 15, 2015 for comments on

surrogate country selection," and because petitioner, in its June 15, 2015 response, "chose not to

comment on the availability and quality of [factors of production] data and financial statements,"

and instead argued "that the six potential surrogate countries on Commerce's list were equally

significant producers," Romania was "not placed into consideration as a potential surrogate

country for the first time until after the [surrogate value] comment stage." Fine Furniture Br. 9, 12.

---

[20]   This regulation directs Commerce not to "consider or retain in the official record of the proceeding . . . [u]ntimely filed *factual information*." 19 C.F.R. § 351.302(d)(1)(i) (emphasis added).

For plaintiff, by accepting petitioner's November 2, 2015 letter stating that Romania's surrogate value suggestions "demonstrate the superiority of Romania as a surrogate country versus Thailand," and by considering surrogate country comments in an *ex parte* meeting, Commerce acted "contrary to the agency's regulations," and therefore, arbitrarily. Letter from Levin Trade Law, P.C. to Commerce (Nov. 2, 2015) (P.R. 254) at 2; *see also* Fine Furniture Br. 11 (citing *Anderson v. U.S. Sec'y of Agric.*, 30 CIT 1742, 1749, 462 F. Supp. 2d 1333, 1339 (2006)), 10-11 ("Commerce determined that 'the exhibit from the *ex parte* meeting and November 2, 2015 language are merely a comparison of data already on the record and do not provide any factual information.' This determination directly contradicts Commerce's own rejection of [petitioner's] untimely surrogate country comments filed as part of [petitioner's] June 29 surrogate submission." (citing Final IDM at 12)).

Plaintiff, therefore, asks the court to enforce the filing deadlines and direct Commerce to reject petitioner's surrogate country submissions because, it argues, "[i]t is hard to imagine that Commerce would have come to the same conclusion if Petitioners had not submitted any arguments alleging that Romania is the appropriate surrogate country . . . ." Fine Furniture Reply Br. Supp. Mot. J. Agency R., ECF No. 111 ("Fine Furniture Reply Br.") 2 ("Without the benefit of Petitioners' arguments, Commerce could not have reasonably supported its selection of Romania with substantial evidence."). Moreover, plaintiff claims that Commerce's "disciplined approach to enforcing filing deadlines [is] a policy upheld by this Court and the Federal Circuit." Fine Furniture Br. 8 (citing *Juancheng Kangtai Chem. Co. v. United States*, 39 CIT __, __, Slip Op. 15-93 at 19 (Aug. 21, 2015) (upholding Commerce's rejection of untimely surrogate country submissions because Commerce found they would "'create undue administrative difficulties' and be 'potentially unfair to the parties'")); *see also Dongtai Peak Honey Indus. Co. v. United States*,

777 F.3d 1343, 1352-53 (Fed. Cir. 2015). Accordingly, plaintiff asks for a "remand [of the Final Results] to Commerce with instructions to first reject [petitioner's] untimely comments and then re-consider its surrogate country determination without relying on these untimely comments." Fine Furniture Br. 12.

The court finds that Commerce's determination to retain petitioner's surrogate country comments was not unlawful. Romania was on Commerce's OP list, and petitioner, prior to the June 15, 2015 deadline, wrote that Romania (along with the other countries) was a "significant producer[] of merchandise comparable to the merchandise subject to this review" and that it believed that "data of at least reasonable availability and quality are available." Letter from Levin Trade Law, P.C. to Commerce Re: Multilayered Wood Flooring from the People's Rep. of China (June 15, 2015) (P.R. 185) at 2-3. Therefore, at the outset of the administrative proceeding, Commerce identified Romania as a viable option for primary surrogate country selection, and, by providing its view that Romania was a significant producer of comparable merchandise, petitioner timely placed Romania into consideration during the surrogate country selection stage. *See* Final IDM at 11 ("The previous surrogate country comments supporting Romania as the surrogate country, submitted on June 15, 2015 were submitted timely, and thus remain on the record."). Plaintiff's citations to *Juancheng* do not persuade the court that Commerce should have rejected petitioner's November submissions because in *Juancheng*, "consideration of India as a potential surrogate country" was not raised until the post-preliminary stage in a respondent's brief (*i.e.*, India was not on Commerce's Import Administration Office of Policy list of countries at the same or comparable level of economic development as China). *See Juancheng*, 39 CIT at __, Slip Op. 15-93 at 19.

Moreover, as Commerce noted, petitioner timely submitted "Romanian surrogate value

data" in its June 29, 2015 submission, and that submission "remain[ed] on the record, and the

Department is duly required to consider the information." Final IDM at 11. Indeed, as a result of

petitioner's timely submission of the Romanian surrogate value data (which was resubmitted on

November 24, 2015 without any arguments regarding the "appropriate" surrogate country),

Commerce was required to "justify its selection of the surrogates based on substantial evidence on

the record," including addressing the Romanian data. *DuPont Teijin Films v. United States*, 37

CIT __, __, 931 F. Supp. 2d 1297, 1307 (2013). Also, Commerce, having considered the surrogate

value information submitted by the petitioner, found that Romanian surrogate value data was

superior to Thailand's. Having made this finding, Commerce had a duty to select the Romanian

information. *See id.*

        With respect to plaintiff's argument that Commerce would not have selected Romania as a

surrogate country but for subsequent submissions to Commerce, it is not clear that this is the case.

As Commerce stated, petitioner

> added no new information to the record in the [November 5, 2015] meeting, neither
> in its discussions nor in documentary form. The exhibit from the *ex parte* meeting
> and November 2, 2015 language are merely a comparison of data already on the
> record and do not provide any new factual information. As stated in the Preliminary
> Results, [petitioner] timely placed information supporting Romania as the surrogate
> country on the record with its June 15, 2015, submission, and, at the time of the
> meeting, in its June 29, 2015, submission, as well as later in its November 24, 2015,
> submission.

Final IDM at 11-12. Thus, Romania was on the OP list as of May 15, 2015, and the Romanian

surrogate value data were properly before Commerce based on the timely June 29, 2015

submission. Thus, the Department was required to compare this data with the Thai surrogate value

data timely submitted by Fine Furniture, which is precisely what it did.

        Finally, plaintiff both had and took the opportunity to rebut the Romanian data. On

November 12, 2015, Fine Furniture presented arguments as to why Thailand is the superior choice

to Romania. *See* Letter from Mowry & Grimson, PLLC to Commerce Re: Rebuttal Surrogate Value Comments (P.R. 274-276); Letter from Mowry & Grimson, PLLC to Commerce Re: Pre-Prelim. Results Comments (P.R. 286). As a result, there is no evidence that plaintiff suffered substantial prejudice, or indeed, any prejudice at all, from Commerce's acts. *See PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006). Accordingly, Commerce's consideration of the petitioner's submissions was in accordance with law.

### B.  Commerce Did Not Fail to Consider Record Evidence Regarding the Thai Data

Next, plaintiff argues that "[e]ven if the Court does not remand Commerce's improper procedural selection of Romania, it must nevertheless reject Commerce's selection as a matter of substantial evidence review," because Commerce "inadequately considered record evidence that established the quality and superiority of the data from Thailand" and failed to "address disqualifying flaws in the Romanian data as required under the best available information standard." Fine Furniture Br. 13. In particular, plaintiff claims that "Commerce did not adequately weigh the strengths and weaknesses of the available data options from Romania and Thailand for labor, financial ratios, electricity and material inputs." Fine Furniture Br. 14. Thus, for plaintiff, the overall weight of the evidence supports the selection of Thailand as the surrogate country because the Thai data is more specific "across the seven categories of data: labor, financial ratios, utilities, materials, packing, materials, freight and by-products." Fine Furniture Br. 40-41. Accordingly, plaintiff maintains that "Commerce's determination . . . was unsupported by substantial evidence and must be remanded to Commerce." Fine Furniture Br. 40. The court will address these arguments in turn.

### 1.  Commerce Reasonably Determined that the Contemporaneous Romanian Labor Data Supported the Selection of Romania as the Primary Surrogate Country

Plaintiff first argues that the "Romanian data are inferior to the Thai data with respect to

labor" because the Thai data is more industry-specific. Fine Furniture Br. 14. In particular, plaintiff claims that "Commerce conceded that 'the Thai labor [surrogate values] are more specific than the Romanian labor [surrogate values] because they are only for the '[m]anufacturing of veneer sheets and wood-based panels [which are key components of Fine Furniture's production],' whereas the Romanian [data] also includes [the manufacturing of] 'articles of straw and plaiting materials [products not produced by Fine Furniture].'" Fine Furniture Br. 14 (quoting Final IDM at 20). Plaintiff makes this argument even though the Romanian data is more contemporaneous. Because plaintiff maintains that specificity to the manufacturing process is more important than contemporaneity, it argues that Commerce erred when it "concluded that the Romanian labor data are superior because they are contemporaneous (2013) with the POR . . . ." Fine Furniture Br. 14. Thus, plaintiff asks that the court "remand with instructions to prioritize specificity . . . ." Fine Furniture Br. 16.

In *Dorbest Limited v. United States*, the Federal Circuit found that Commerce's regression method for determining labor surrogate values in nonmarket economy countries (by averaging wage rate data collected from multiple countries) was not consistent with 19 U.S.C. § 1677b(c)(4), and thus, invalidated Commerce's regulation codifying the regression-based method (19 C.F.R. § 351.408(c)(3)). *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372-73 (Fed. Cir. 2010). Commerce subsequently published its New Labor Rate Policy, in which it stated that it would begin using wage rate data found in Chapter 6A of the International Labor Organization's ("ILO") *Yearbook of Labor Statistics*[21] from the primary surrogate country to value labor. *See Antidumping*

---

[21]     As Commerce stated in its New Labor Rate Policy, "[t]he ILO collects labor cost data by country and industry, which is reported on the basis of the United Nations' International Standard Classification of All Economic Activities . . . . The industry-specific data is revised periodically, and not all revisions report data for all industries." New Labor Rate Policy, 76 Fed. Reg. at 36,094. Chapter 6A of the ILO *Yearbook of Labor Statistics* covers all costs related to labor

*Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce June 21, 2011) ("New Labor Rate Policy").

Plaintiff claims that that the notice announcing the New Labor Rate Policy states a preference for industry-specificity over contemporaneity. Plaintiff refers to the following language:

> [Commerce] will value the [nonmarket economy] respondent's labor input using industry specific costs prevailing in the primary surrogate country, as reported in Chapter 6A of the ILO Yearbook of Labor Statistics . . . [Commerce] sorts the ILO data *based on data parameters* **in the following order**: **1. "Sub-classification,"** i.e., if there is no industry-specific data available for the surrogate country within the primary data source, [*i.e.*, ILO Chapter 6A data] . . .; 2. "Type of Data," i.e., reported under categories compensation of employees and labor cost . . . **3. "Contemporaneity,"** i.e., [Commerce] uses the most recent earnings/wage rate data point available. 4. The unit of time for which the wage is reported . . . . [Commerce selects from the following categories *in the following hierarchy*: (1) per hour; (2) per day; (3) per week; or (4) per month.]

Fine Furniture Br. 14 (quoting New Labor Rate Policy, 76 Fed. Reg. at 36,094 n.11) (boldface as in original; italics supplied). For plaintiff, "[t]he plain language of this statement ('data parameters in the following order') unquestionably elevates the importance of industry specificity over contemporaneity in Commerce's choice of labor data within the selected surrogate country." Fine Furniture Br. 15. Plaintiff, therefore, maintains that "[t]his same policy should not be ignored when comparing sources from two countries and based on Commerce's own admission, the Thai data are more industry-specific . . . ." Fine Furniture Br. 15.

Commerce's selection of the Romanian labor data is supported by substantial evidence. As an initial matter, the court is not convinced that the list plaintiff cites to in the New Labor Rate

---

including wages, benefits, housing, training, etc. (as distinct from, for example, Chapter 5B data, which reflects only direct compensation and bonuses). New Labor Rate Policy, 76 Fed. Reg. at 36,093.

Policy constitutes a "hierarchy" of anything other than the types of data within each "data parameter." The list (notably described as a list of "filters" to "determine the most appropriate labor cost data to use") breaks out four main categories, or "data parameters": (1) "Sub-Classification"; (2) "Type of Data"; (3) "Contemporaneity"; and (4) "The unit of time for which the wage is reported." Within each data parameter, however, is an express hierarchy:

> The Department sorts the ILO data based on data parameters in the following order:
>
> 1. "Sub-classification," i.e., *If there is no industry-specific data available for the surrogate country within the primary data source*, i.e., ILO Chapter 6A data, the Department *will then look to national data* for the surrogate country for calculating the wage rate;
>
> 2. "Type of Data," i.e., reported under categories compensation of employees and labor cost. *We use labor cost data if available and compensation of employees where labor cost data are not available*;
>
> 3. "Contemporaneity," i.e., the Department uses *the most recent* earnings/wage rate data point available;
>
> 4. The unit of time for which the wage is reported. The Department selects from the following categories *in the following hierarchy*: (1) per hour; (2) per day; (3) per week; or (4) per month. Where data is not available on a per-hour basis, the Department converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month.

New Labor Rate Policy, 76 Fed. Reg. at 36,094 n.11 (emphasis added). Thus, the list does not establish a hierarchy among the "data parameters" themselves, but rather, provides a way for Commerce to prioritize different data within each category. That is, there is no indication that the order in which the categories themselves are listed has any significance.

Indeed, as has often been noted when Commerce evaluates surrogate value data generally, it "prefers surrogate[] values that are contemporaneous with the period of review, publicly available, product-specific, representative of broad market average prices, and free of taxes and import duties," and it "has not identified a hierarchy among these factors, and the weight accorded

to a factor varies depending on the facts of each case." *Xiamen Int'l Trade and Indus. Co.*, 37 CIT at __, 953 F. Supp. 2d at 1312-13. Therefore, it is unlikely that Commerce established such a hierarchy between contemporaneity and specificity for the labor surrogate value alone while having no hierarchy for other factors of production.

Moreover, plaintiffs do not argue that the Romanian labor data is not industry-specific. Rather, they argue that the Thai data is more specific. But plaintiffs have provided no reason for the court to conclude that it was unreasonable for Commerce to find that less specific, contemporaneous data is preferable to non-contemporaneous data that is more specific. As both contemporaneity and specificity are generally given equal weight by Commerce, it was reasonable for Commerce to find that the Romanian data was specific enough and to prefer contemporaneous data in this instance. *See id.* Accordingly, the court finds that Commerce's selection of the contemporaneous Romanian labor data is supported by substantial evidence, and supports its selection of Romania as the primary surrogate country.

### 2. Commerce Reasonably Determined that the Romanian Electricity Data Is More Specific than the Thai Electricity Data

In the Final Results, Commerce valued electricity using Eurostat data for Romania, averaging all bands (or classifications based on consumption rate) of industrial consumers for the second half of 2013 and the first half of 2014. *See* Surrogate Value Mem. for the Preliminary Results (Dec. 31, 2015) (P.R. 298) at 5; Final Surrogate Value Mem. at 1. Plaintiff argues that "the Thai electricity rates . . . are specifically for Large General Service, which Fine Furniture selected as the most comparable classification to its own user category in China." Fine Furniture Br. 22-23. Plaintiff then states that the Romanian electricity data "represent six different bands that are differentiated by annual consumption and maximum demand," and "represent various rates for industrial electricity – small to large." Fine Furniture Br. 22. Thus, plaintiff argues that because

the "Romanian data include irrelevant industrial user categories while the Thai data are specific to Large General Service," the Thai electricity data is more specific. Fine Furniture Br. 23.

Fine Furniture next contends that in its submission it "used its own actual POR monthly [electrical] consumption data along with the Thai demand charge to calculate a Demand Charge per KWH, making this portion of the electricity [surrogate value] more specific to Fine Furniture's production of subject merchandise." Fine Furniture Br. 23. Plaintiff argues that its approach is an "established practice," and Commerce was required to provide a reasonable explanation for departing from this method and instead valuing the electricity input using Romanian Eurostat data without employing Fine Furniture's actual POR monthly electrical consumption data.[22] Plaintiff maintains that Commerce failed to provide such an explanation. Therefore, plaintiff contends that "Thailand provides more specific and accurate electricity [surrogate value] data than Romania and, thus, Commerce's reliance on Romania's electricity [surrogate value] as part of its surrogate country determination was unsupported by substantial evidence." Fine Furniture Br. 23.

Fine Furniture then argues that the "Thai electricity data are also of better quality than the Romanian data." Fine Furniture Br. 21. In particular, plaintiff claims that the Thai electricity data is more detailed because it "provide[s] both peak and off-peak charges that allow Commerce to calculate a weighted-average," which "is a more precise representation of the actual costs for an energy consumer," when compared to the "Romanian single-tariff electricity data." Fine Furniture Br. 21-22. In other words, because the Thai data provides peak and off-peak rates, plaintiff claims that they "account for natural difference[s] in price structure" caused by varying electricity rates

---

[22]      The Romanian electricity rates were reported as biannual kilowatts per hour (KWH), and Commerce obtained the average rate of 0.3271 Lei per kilowatt-hour. Commerce did not inflate this electricity rate, because it was contemporaneous with the POR. *See* Surrogate Value Mem. for the Preliminary Results (Dec. 31, 2015) (P.R. 298) at 5.

during peak and off-peak hours. Fine Furniture Br. 22.

The court finds that Commerce's selection of the Romanian single-tariff electricity data was supported by substantial evidence. As an initial matter, Fine Furniture's arguments that (1) the Thai electricity rates are specifically for "Large General Service," and therefore are more specific to Fine Furniture, and (2) Commerce should have used Fine Furniture's "own actual POR monthly consumption data along with the Thai demand charge to calculate a Demand Charge per KWH," were not made before Commerce, and thus, have not been properly exhausted. Accordingly, the court will not take these issues up for the first time here. *See, e.g.*, *Gerber Food (Yunnan) Co. v. United States*, 33 CIT 186, 194, 601 F. Supp. 2d 1370, 1379 (2009); *Mid Continent Nail Corp. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1247, 1259-60 n.10 (2013) ("Issues that are not addressed in an administrative case brief filed with the agency are generally deemed abandoned.").

As to plaintiff's claim that the Thai electricity rates are more specific because they provide both peak and off-peak charges from which the Department could calculate a weighted average, the court finds that Commerce's decision to use the Romanian electricity data is supported by substantial evidence. In the Final Results, Commerce emphasized that Fine Furniture itself did not report different values for its own electricity consumption based on peak or off-peak hours, nor did it provide the Department with any proposed calculations for using peak and off-peak rates. *See* Final IDM at 21. Thus, because Fine Furniture never documented any difference in its electricity consumption during peak or off-peak hours, the Thai prices do not add greater accuracy. *See* Final IDM at 21 ("[T]here is only one surrogate value applied to Fine Furniture's consumption per CONNUM, which represents an average of the period." (citing, *inter alia*, Fine Furniture's Sec. D Resp. (June 12, 2015), at Ex. D-15, D-15)). In addition, Commerce found that because the Romanian electricity data "is an average of twelve data points" contemporaneous with the POR,

whereas the Thai data would have been an average of only three data points, the Romanian data

was of better quality. *See* Final IDM at 21; *Dorbest Ltd. v. United States*, 30 CIT 1671, 1708, 462

F. Supp. 2d 1262, 1294 (2006) ("Commerce has acknowledged . . . the desirability of a broader

data set . . . ."). In other words, because the Romanian data represents a greater number of data

points regarding industrial electricity consumption, its average will be more precise. *See*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,367 (Dep't Commerce May

19, 1997) ("In general, we believe that more data is better than less data, and that averaging of

multiple data points . . . should lead to more accurate results in valuing any factor of production.").

Thus, the court finds this decision to be supported by substantial evidence.

### 3. Commerce Reasonably Determined that the Romanian Data Are More Specific for Important Raw Materials than the Thai Data

Next, plaintiff argues that "Commerce's determination that the Romanian HTS is more

specific overall for material inputs [as distinct from labor and electricity] is unsupported by

substantial evidence as shown by a close examination of three key inputs – lumber, glue and

veneers – as well as a summary comparison of all additional inputs . . . ." Fine Furniture Br. 23.

### a. Lumber

Plaintiff first claims that Commerce's finding that "five of Fine Furniture's seven lumber

inputs are more specifically classified using the Romanian HTS" is unsupported by substantial

evidence because it "improperly elevates the importance of lumber species over the planed

characteristic and it relies on an erroneous HTS classification for Sapelli lumber." Fine Furniture

Br. 23-24 (citing Final IDM at 17). Plaintiff's argument stems from Commerce's recognition that

Fine Furniture's lumber is "planed" because "Fine Furniture's production process does not list the

process of 'planing.'" Fine Furniture Br. 24 (quoting Final IDM at 24 n.70). For plaintiff, this

statement confirms that Commerce was aware that the lumber it bought was already planed.

According to Fine Furniture, if it had purchased "rough lumber that was not planed, it would have [had] to take an additional production step to further finish the rough lumber into a planed form to make its finished flooring product." Fine Furniture Br. 24. Thus, plaintiff argues that "once the most accurate HTS [subheadings] are selected" (*i.e.*, HTS subheadings that describe planed wood), the Thai HTS schedule offers greater specificity for five[23] lumber inputs and equal specificity for the rest. Fine Furniture Br. 24 ("Commerce was required to consider [surrogate values that are] as representative of the production process in the NME country as possible." (internal quotations and emphasis omitted).

Relying on the planing characteristic, plaintiff claims the Thai HTS offers greater specificity for five of the seven species it uses in its manufacturing process—tigerwood, jatoba, santos mahogany, poplar, and sapelli lumber. The Romanian HTS description, on the other hand, contains "rough, un-planed" lumber. Fine Furniture Br. 23-32, 26 ("The HTS descriptions show that the Romanian HTS classifications represent non-planed lumber but the Thai classifications specifically *include* 'planed' lumber."). Plaintiff makes its specificity argument even though the Thai HTS subheadings are not species-specific to most of the lumber species it used to make its products, while the Romanian subheadings are species-specific.

Although plaintiff accepts that "species is one characteristic of Fine Furniture's lumber inputs," and although the Thai subheadings plaintiff proposes are not species-specific, it nevertheless maintains that "Commerce was wrong to elevate . . . [species] over the importance of planing . . . because the latter is directly linked to an additional step in the production process, which would by nature include additional equipment, materials and maintenance costs." Fine

---

[23]     Plaintiff actually argues that the Thai HTS schedule offers greater specificity for four of the seven lumber species, but this is because plaintiff treats tigerwood and jatoba as one input.

Furniture Br. 25. Therefore, given a choice between planed lumber of a different species or rough lumber of the same species, Fine Furniture maintains that Commerce's "only reasonable choice" was to select the Thai HTS reflecting planed lumber. Fine Furniture Br. 26.

With regard to the remaining lumber inputs (white oak and European white oak), plaintiff contends that the Thai and Romanian HTS schedules are equal in specificity because they are species-specific in both countries, and both HTS classifications represent planed lumber. *See* Fine Furniture Br. 24, 30.

Commerce's selection of the Romanian HTS for lumber inputs is supported by substantial evidence. The evidence cited by plaintiff suggests that, at best, Commerce was presented with two permissible HTS subheadings (*i.e.*, categories describing only planed lumber which were not specific as to wood species and categories that did not include planed lumber, but were specific to wood species). As Commerce states, species of wood is an important characteristic in producing Fine Furniture's product, as demonstrated by it being the first product characteristic in the CONNUM for Fine Furniture's flooring.[24] Final IDM at 18. Indeed, Fine Furniture's final factors of production descriptions for surrogate value purposes describe all lumber inputs by species. *See* Fine Furniture's Suppl. Sec. D Resp. (C.R. 166), at Ex. D-6, D-10.

Moreover, if an HTS subheading was both species-specific and included planed lumber, Commerce chose that subheading (*e.g.*, Commerce's HTS selection for white oak[25]), however,

---

[24]    Commerce collects data from each respondent to determine the cost of production on a product-specific CONNUM basis, as defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise.

[25]    In the case of oak inputs (both white and European), Commerce chose the Romanian HTS because it specifically excluded "blocks strips and friezes for parquet of wood block flooring, not assembled," and was therefore more specific than the Thai HTS subheading.

because "no imports occurred in either country" during the period of review under certain subheadings that were both species-specific and planed (*e.g.*, in the case of sapelli[26] lumber), the Department reasonably found that it had to use "an alternative classification," which in these circumstances, prioritized wood species over the "planed" characteristic. Final IDM at 18.

Plaintiff makes no convincing argument as to why planed wood should be found to be more specific than a wood's species. Although Commerce recognized the importance of planed wood in Fine Furniture's production process, it ultimately determined (at least in part due to Fine Furniture's own description of its inputs) that species specificity was of greater importance. Plaintiff would have it otherwise, but gives no reason as to why planing should be more important than species. Had Fine Furniture shown that planed lumber was more important to the cost of the lumber input than its species, for instance, the court might find otherwise. Having failed to provide a rationale for finding that Commerce's choice was unreasonable, Fine Furniture cannot prevail. Thus, the court finds that Commerce's determination regarding lumber inputs is supported by substantial evidence.

---

*See* Final IDM at 24.

[26]     As stated in the Final Results, Commerce was unable to use either the Thai or Romanian HTS categories describing both species-specific and planed sapelli lumber. This was because no imports occurred in either country under those particular subheadings during the POR. *See* Final Results at 18. There were, however, imports under the species-specific, un-planed Romanian HTS category, and therefore Commerce chose this subheading over a non-specific, planed Thai alternative. Plaintiff's attempt to call this a "misreading of the relevant HTS schedules," is puzzling. *See* Fine Furniture Br. 31. Commerce did not claim that there were no Thai HTS categories that were species-specific, but simply found that there were no imports during the relevant period under the Thai HTS category. *See* Final IDM at 18 ("Unlike Thailand, which had no imports during the period under the "Sapelli" specific headings, there were imports to Romania under the 4407.27.99 "Sapelli" specific heading. Therefore, the Department finds that the Romanian HTS is more specific for valuation of Fine Furniture's "Sapelli" lumber than the Thai HTS.").

     **b. Veneers**

Plaintiff also argues that "Commerce improperly determined that the Romanian HTS [subheadings] for veneers are more specific" than the Thai HTS subheadings because Commerce "improperly understated the face veneer specificity and failed to adequately consider the planed characteristic." Fine Furniture Br. 35. Thus, as with the lumber input, plaintiff maintains that Thai HTS subheadings, which specifically include the "planed" characteristic and because they specifically break out "face veneer sheets," should outweigh Romanian HTS subheadings, which are more specific in terms of veneer thickness and wood species. *See* Fine Furniture Br. 37. Thus, plaintiff argues that "Thailand provides overall greater specificity on veneers." Fine Furniture Br. 38.

It is uncontested that the Thai subheading is more specific within the coniferous category for face veneers. Nevertheless, defendant responds that "the Romanian HTS [subheadings] presented greater specificity" because "[f]or all veneers, and particularly 'face veneers,' *pricing varies significantly based on relative thickness* . . . ." Def.'s Br. 22 (emphasis added). Defendant argues that "[t]he second product characteristic in the [product] control number [listed by Fine Furniture] . . . is 'Face (Veneer) Thickness,' thus indicating its importance in the hierarchy of the product characteristics." Def.'s Br. 22. Therefore, the Department maintains that because "the Romanian HTS provides greater thickness specificity for 'tropical' and 'other' face veneers" by providing a "break down by thickness," its decision to use the Romanian data is supported by substantial evidence. Def.'s Br. 23.

Commerce's decision to use the Romanian HTS subheadings to value Fine Furniture's veneers is indeed supported by substantial evidence. As Commerce states, "For all veneers and particularly 'face veneers' pricing varies significantly based on relative thickness and whether or

not they are planed, sanded or end jointed." Final IDM at 19. Thus, Commerce recognized that specificity in both thickness and in the "planed" characteristic is important in valuing Fine Furniture's veneers. To break the tie, however, Commerce reasonably relied on Fine Furniture's listing as its second product characteristic in the multilayered wood flooring CONNUM "thickness of face veneer," which, for Commerce, suggested the characteristic's greater importance in the "hierarchy of product characteristics," and tipped Commerce in favor of preferring specificity in wood thickness over the planed characteristic. Final IDM at 19-20. This decision is not unreasonable. A manufacturer would normally list product characteristics in order of importance. Therefore, because the Romanian HTS subheadings for "tropical" and "other" face veneers provide specific breakouts for wood thickness, Commerce's decision to use the Romanian HTS subheadings for these inputs was supported by substantial evidence.

With regard to the "coniferous" category, although plaintiff is correct that the Thai HTS subheading is more specific for this category as it is not only species-specific, but also provides a breakout for Fine Furniture's product (*i.e.*, "face veneer sheets"), the court nevertheless finds that Commerce's decision to use the Romanian HTS subheading is reasonable. Specifically, based on the observation that cost varies with thickness, the court finds Commerce reasonably determined that greater specificity in one out of the three categories does not outweigh "the species and thickness attribute specificity" applicable to all of the Romanian HTS subheadings for veneers. As Commerce stated,

> While there are specific break outs in the Thai HTS for "Teak Veneer" and coniferous "Face Veneers," the Department must determine the most specific [surrogate value] for all veneers. Additionally, Fine Furniture has not stated why the teak veneer HTS is applicable to its [normal value] calculation. The Department has determined that the species and thickness attribute specificity, applicable to all veneers, outweighs the one or two specific "face veneer" break outs that may occur in the Thai HTS.

Final IDM at 20. The court finds it reasonable that, overall, Commerce concluded the specificity in thickness applicable to all veneers outweighs having specific breakouts for coniferous veneers because using veneer thickness results in a more accurate cost. Therefore, the court finds Commerce's determination is supported by substantial evidence.

### c.  Glues

In the Final Results, Commerce selected various eight-digit Romanian HTS categories to value Fine Furniture's glue, which Commerce found to be "the most specific category in the Romanian HTS." Final IDM at 17. Plaintiff argues that "Commerce erred in relying on the 8-digit Romanian HTS [subheadings] for numerous glues consumed by Fine Furniture in its manufacturing process when the more specific 11-digit Thai HTS [subheadings] are available" in the Thai data. Fine Furniture Br. 32. For plaintiff, because "all Thai 11 digit HTS [subheadings] listed [by it] specify 'other,'" then "by definition," they exclude "additional irrelevant products that Fine Furniture did not consume." Fine Furniture at 34. Thus, for plaintiff, the Thai HTS "other" subheadings are "more specific than the . . . Romanian codes that do not offer the further 'other' description." Fine Furniture Br. 34 ("Looking at the big picture, any time an HTS [subheading] uses 'other,' it is excluding some other descriptive language. 'Other' can be read as 'other than.'"). Therefore, plaintiff argues that the additional descriptive "others" in the Thai HTS subheadings makes the Thai data the best available information.

Plaintiff then points out that Fine Furniture provided Commerce with a surrogate value spreadsheet containing a summary of the relevant inputs, surrogate values, and sources of the surrogate values, including a table of suggested Thai HTS subheadings for its glue inputs, in its June 29, 2015 surrogate value submission. Plaintiff maintains that Commerce should have relied on this information and found the Thai data was more specific than the Romanian data on glue

inputs. *See* Fine Furniture Br. 34 ("[T]he very fact that Fine Furniture selected these 11-digit [Thai]

codes in a certified factual submission establishes that these codes best represent Fine Furniture's

glues and should have been given weight by Commerce.") (citing *Polyethylene Retail Carrier Bag

Comm. v. United States*, 232 Fed. Appx. 965, 972 (Fed. Cir. 2007)). For plaintiff, "Commerce's

own practice supports relying upon a respondent's own representations as to the actual input used

in their production process," Fine Furniture Br. 34 (citing *Polyethylene Retail Carrier Bag Comm.

v. United States*, 29 CIT 1418, 1436, Slip Op. 5-157 at 30 (Dec. 13, 2005)), and therefore,

"Commerce was required to accept Fine Furniture's own representation of its glue inputs . . . ."

Fine Furniture Br. 34-35.

The court finds that Commerce's selection of the Romanian HTS subheadings to value

Fine Furniture's glue inputs is supported by substantial evidence. In making this holding, the court

first emphasizes that there is nothing on the record regarding the specific composition of Fine

Furniture's glue, and therefore, any "claims of greater specificity of the HTS subheadings that can

be applied to them are immaterial." Final IDM at 17. It is the parties' obligation to create the

agency record. *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)

(citation omitted) ("The burden of production [belongs] to the party in possession of the necessary

information."); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir.

2002) (respondent has burden to create an accurate record). Indeed, where, as here, plaintiff

provided no record of the chemical composition of its glue, there is also no way to determine if

plaintiff's claim that additional "other" descriptions afforded by an eleven-digit HTS subheading

would actually be more specific to Fine Furniture's glue input. In other words, there is no way to

verify whether the "excluded" definitions in an eleven-digit code should be excluded or not. Thus,

Fine Furniture's claim that the Thai data is more specific simply because Fine Furniture used Thai

data on its surrogate value spreadsheet is unconvincing. Moreover, Commerce found that the Romanian data matched the types of glue Fine Furniture used (*i.e.*, glue urea, glue melamine, etc.). *See* Final IDM at 17. Fine Furniture's mere claim, with no basis in the record, that the Thai HTS excludes "irrelevant products," is not enough to make Commerce's selection unreasonable. Therefore, Commerce did not act unreasonably in selecting the Romanian data.

As to Fine Furniture's June 29, 2015 surrogate value submission that provided a table containing specific Thai HTS subheadings the company considered to best fit its own glue inputs, the court notes that Fine Furniture did not provide any comparison between the HTS descriptions and its own submitted factors of production descriptions. Although such a comparison is not required, it would have provided Commerce with some evidence as to the accuracy of Fine Furniture's suggested HTS categories. Lacking any record evidence as to the composition of Fine Furniture's glues, and because Commerce's preference to value all factors from the primary surrogate country is reasonable, the court finds that Fine Furniture's table provides no reason why the government's decision not to accept the suggested Thai HTS categories at face value was unreasonable.

### 4. Fine Furniture Failed to Exhaust Its Administrative Remedies Regarding the Claimed Superiority of Thai Data for Additional Inputs

Next, plaintiff argues that Thailand provides more specific surrogate value data for valuing certain additional inputs, including chemical materials and freight. Fine Furniture Br. 39-40. Plaintiff also claims that there is equal specificity between Romania and Thailand for purposes of valuing water, coal, finishing materials, and by-products. *See* Fine Furniture Br. 39-40.

In response, defendant states that "Fine Furniture did not raise these claims before Commerce in its administrative case brief," and "[t]he Court should decline to address them now." Def.'s Br. 28.

Plaintiff's arguments were not properly exhausted before Commerce. Before the Department, Fine Furniture argued that specific "key surrogate values" "demonstrate[] that the record overwhelmingly supports the choice of Thailand as the surrogate country over Romania": (1) various raw materials, including oak lumber, thinner, glues, lumber, and veneers; (2) labor; and (3) electricity. *See* Fine Furniture Case Br. at 26, 15-26. Although plaintiff claims it can raise arguments regarding additional surrogate values for the first time in its brief before the court because "Commerce revised numerous surrogate values in the Final Results and thus, a re-framing of the overall picture of all inputs [is] necessary to the Court," Fine Furniture Reply Br. 19, the court is unconvinced. As the Final Surrogate Value Memorandum makes clear, "[m]any of the factor valuations remain unchanged since the publication of the preliminary results." Final Surrogate Value Mem. at 1. Indeed, the Final Surrogate Value Memorandum shows that the Department only revised surrogate values for white and European oak lumber, tigerwood lumber, jatoba lumber, sapelli lumber, the calculation of surrogate financial ratios, and the calculation of brokerage and handling. Final Surrogate Value Mem. at 1-2. None of these revisions involve the "additional" surrogate values newly raised in plaintiff's brief, and thus, it is not the case that "plaintiff had no opportunity to raise the issue at the administrative level." *LTV Steel Co., Inc. v. United States*, 21 CIT 838, 869, 985 F. Supp. 95, 120 (1997). Therefore, because no contrary reason exists for departing from the exhaustion requirement, the court declines to entertain these new arguments. *See, e.g.*, *Mid Continent Nail Corp.*, 37 CIT at __, 949 F. Supp. 2d at 1259-60 n.10.

## II.    Commerce Reasonably Relied on the Sigstrat Financial Statement

In the Final Results, Commerce "concluded that the Romanian financial statement from Sigstrat [was] [the] best available [information] on the record of th[e] proceeding." Final IND at

15. Plaintiff argues that Commerce's decision to use a Romanian financial statement is unsupported by substantial evidence because there are "more and better financial statements available from Thailand than Romania." Fine Furniture Br. 16.

First, plaintiff argues that the "Romanian financial statement on the record [(Sigstrat's)] is distorted by significant government influence," and therefore is not usable. Fine Furniture Br. 18. To support its position that the financial statement is distorted, plaintiff points to the Sigstrat financial statement itself, which notes "[i]ncreasing costs of wood dictated by the state or confirmed by the state policy" and "[i]ncreasing energy costs 'dictated' by the state or state confirmed." Fine Furniture Br. 18. Plaintiff also points to portions of the Sigstrat financial statement stating that "[t]he company cannot increase prices by 15-20%, as the state can" and that "'due to state policy within the industry,' the company 'will have to fight bankruptcy in 2015.'" Fine Furniture Br. 19. For plaintiff, these statements support a finding that "[g]overnment influence severely jeopardizes Sigstrat's financial health." Fine Furniture Br. 19. Thus, plaintiff maintains that Sigstrat's financial statements cannot be used.

Plaintiff further maintains that by "acknowledg[ing] that Romsilva [(a state-owned company)] is a domestic competitor to Sigstrat and as such has an influence on the market in Romania," Commerce has conceded its point. See Fine Furniture Br. 19. In other words, plaintiff rejects Commerce's conclusion that "the existence of a competitor that is much larger than Sigstrat do[es] not amount to an argument of a potential distortive influence over" Sigstrat's financial results and that "there is no information in Sigstrat's financial statement to support the contention that Sigstrat is restricted with regard to its pricing or production by Romsilva's activities." Final IDM at 12. Plaintiff then argues that Sigstrat "cannot be accurately classified as a *market-economy* company . . . when its own financial statements show that it is operating in an industry with

significant state control" and that the company "faced bankruptcy 'due to state policy within the industry.'" Fine Furniture Br. 19 (quoting Final IDM at 12). Thus, plaintiff maintains that "Commerce's decision to use Sigstrat in the final results, especially in the face of two other accurate statements, must be overturned by this Court as unsupported by substantial evidence." Fine Furniture Br. 19-20.

Second, plaintiff argues that Commerce "failed to adequately consider evidence that Sigstrat received countervailable subsidies in the form of investment subsidies." Fine Furniture Br. 20. That is, plaintiff claims that because "Commerce's consistent practice is to disregard financial statements that include evidence of subsidies," Commerce should have found that the line item in Sigstrat's annual report listing an "investment subsidy" was enough to cause Commerce to "believe or suspect" that Sigstrat was receiving a countervailable subsidy. Fine Furniture Br. 20 (first citing *Goldlink Indus. Co. v. United States*, 30 CIT 616, 629, 431 F. Supp. 2d 1323, 1334-35 (2006) and then citing *Fuyao Glass Indus. Grp. v. United States*, 29 CIT 109, 119, Slip Op. 5-6 at 16-17 (Jan. 25, 2005)); *see also* Fine Furniture Br. 20 ("By requiring such a high bar to even consider evidence of subsidies [(*i.e.*, by requiring a CVD determination on the particular program in the particular country)], Commerce goes beyond Congress's intention in the governing statute, which was *not* for Commerce to conduct a full investigation regarding subsidies received by a surrogate producer." (citing H.R. Conf. Rep. No. 100-576 at 590-91, *reprinted in* 1988 U.S.C.C.A.N. at 1623-24)).

Finally, plaintiff claims that because there are two Thai financial statements (those of Neotech and Lampang) on the record, the Thai financial statements are necessarily "more accurate" than the single Romanian financial statement. Fine Furniture Br. 17. For plaintiff, this is because "'*multiple* financial statements . . . eliminate distortions.'" Fine Furniture Br. 17 (quoting

*Jiaxing Brother Fastener Co. v. United States*, 38 CIT __, __, 961 F. Supp. 2d 1323, 1332 (2014));
*see also* Fine Furniture Br. 17 ("Commerce has recognized that multiple financial statements lead
to more accurate surrogate financial ratios." (citations omitted)).

The court finds Commerce reasonably determined the Sigstrat financial statement was
usable and not distorted by government influence or subsidies. Commerce has provided adequate
reasons why the mere presence of a large state-owned entity within the wood industry did not
render Sigstrat's financial statement unusable. Specifically, Commerce found that "there is no
information in Sigstrat's financial statement to support the contention that Sigstrat is restricted
with regard to its pricing or production by Romsilva's activities, or that Sigstrat is itself directly
under the control of the Romanian Government." Final IDM at 12 ("[P]rice increases in a non-
contemporaneous period (*i.e.*, 2012), and the existence of a competitor that is much larger than
Sigstrat do not amount to an argument of a potential distortive influence . . . .").

With respect to the statements cited by plaintiff concerning increasing costs, the court notes
that these statements were forward-looking, and therefore did not address the actual period of time
to be used to calculate the financial ratios. Moreover, other record evidence seems to demonstrate
that Sigstrat was not under the control of any single supplier. *See* Final IDM at 13 ("Sigstrat
reported in its annual report . . . that it had 'no significant reliance on a single supplier whose loss
would affect the company's business.' Thus, while it is possible in theory for a government
supplier to place restrictions on an industry that influence pricing and production, the above
statement supports the Department's determination that . . . [the Romanian government] did not
significantly impact Sigstrat's operations."). In other words, since Sigstrat was not restricted to
buying its wood from primarily a single source, there was no evidence that the purchases were not
market-based.

In addition, Commerce reasonably found that the Sigstrat financial statement did not give it "reason to believe or suspect" that the company had received a specific countervailable subsidy. While Sigstrat's financial statement does contain a line item titled "Investment Subsidy," there is no additional information on the record as to the specific nature of this line item or where it comes from (*e.g.*, whether the "subsidy" is conferred under a government program). Moreover, the Department stated that it has "never found any subsidy programs in Romania to be countervailable, and none have even been alleged to be countervailable in a petition," which reasonably gave Commerce even less "reason to believe or suspect" that Sigstrat was in receipt of a countervailable subsidy. Final IDM at 14; *see also Clearon Corp. v. United States*, 35 CIT 1685, 1688, 800 F. Supp. 2d 1355, 1359 (2011) (citation omitted) ("If a financial statement contains only a mere mention that a subsidy was received, and for which there is no additional information as to the specific nature of the subsidy, Commerce will not exclude the financial statement from consideration."); *Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1275-76, 641 F. Supp. 2d 1362, 1379-80 (2009) (sustaining Commerce's determination that the "reason to believe or suspect" standard was not satisfied although the selected financial statement mentioning "subsidy" was received because there was no additional substantiating evidence of countervailability).

Not all subsidies are countervailable subsidies. *See Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1323 n.2 (Fed. Cir. 2013) ("We note that not all subsidies are countervailable under U.S. trade laws."); *see also, e.g.*, *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 112 F. Supp. 2d 1141 (2000) (finding that Commerce reasonably determined that loans made to the Belgian steel industry by a public credit institution were not specific, and thus, not countervailable); *PPG Indus., Inc. v United States*, 978 F.2d 1232 (Fed. Cir. 1992) (finding that substantial evidence supported the Commerce's determination that a trust fund program

established by the Mexican government and Bank of Mexico assisting all Mexican firms with foreign indebtedness did not provide benefits to specific industry and therefore was not countervailable). As a general rule, a subsidy is countervailable if a government provides a financial contribution, a benefit is conferred, and the subsidy is specific.[27] *See* 19 U.S.C. § 1677(5). Thus, the mention of a subsidy in a financial statement does not necessarily give Commerce a reason to believe or suspect that the subsidy is countervailable. Accordingly, the court finds that Commerce reasonably found that it did not have "reason to believe or suspect" that Sigstrat was receiving countervailable subsidies.

In light of evidence directly contradicting plaintiff's theories, and an adequate explanation for Commerce's preference, the court finds that Commerce's decision to use the Sigstrat financial statement is reasonable, and supported by substantial evidence on the record. *See Goldlink Indus. Co.*, 30 CIT at 628-29, 431 F. Supp. 2d at 1334-35.

Finally, despite plaintiff's arguments to the contrary, Commerce's use of the single Romanian financial statement is reasonable. As an initial matter, before Commerce, Fine Furniture did not argue that using multiple financial statements would necessarily lead to more accurate results. *See* Fine Furniture Case Br. at 28. Rather, it argued that "there is no basis to conclude that the distorted financial statement of Sigstrat provides superior data, especially when the Department itself recognizes the usability of *two* financial statements from Thailand." Fine Furniture Case Br. at 14 (emphasis in original). In other words, Fine Furniture argued that Romania had no usable financial statements, whereas Thailand had two usable financial statements. Fine Furniture did not mention anything, however, about multiple financial statements resulting in more accurate

---

[27]     Whether a subsidy is "specific" depends on the type of subsidy, *i.e.*, whether it is an "export subsidy," an "import substitution subsidy," or a "domestic subsidy," all of which must meet specific statutory requirements before being deemed "specific." *See* 19 U.S.C. § 1677(5A).

surrogate values. Therefore, plaintiff's argument regarding the greater accuracy of multiple

financial statements is not properly before the court. *See Gerber Food*, 33 CIT at 194, 601 F. Supp.

2d at 1378.

Even if this argument were before the court, however, it would not carry the day. As shall

be seen, given the totality of factors supporting Romania's selection as the primary surrogate

country, Commerce's decision to use the Sigstrat financial statement was reasonable considering

its reasonable preference to value all factors from a single country. *See Clearon Corp.*, 37 CIT at

__, Slip Op. 13-22 at 13 ("[T]he use of a 'single surrogate country' is justified when . . . all other

factors are 'fairly equal' because minimizing distortion supports a finding that Commerce relied

upon the best available information on the record."); *Jacobi Carbons AB v. United States*, 38 CIT

__, __, 992 F. Supp. 2d 1360, 1376-77 (2014) ("This preference [(*i.e.*, to value all factors of

production with a single surrogate country)] stems from the sensible conclusion that 'deriving the

surrogate data from one surrogate country limits the amount of distortion introduced into [the

Department's] calculations because a domestic producer would be more likely to purchase a

product available' domestically." (quoting *Clearon Corp.*, 37 CIT at __, Slip Op. 13-22 at 13));

*see also Certain Frozen Warmwater Shrimp From the Socialist Rep. of Vietnam*, 76 Fed. Reg.

56,158 (Dep't Commerce Aug. 31, 2011), and accompanying Issues and Dec. Mem., cmt. 2 ¶ J

(noting the Department's practice "to rely upon the primary surrogate country for all surrogate

values whenever possible"). Here, unlike in *Jiaxing Brother*, where the single financial statement

selected by Commerce had also been rejected in a contemporaneous proceeding, none of the three

financial statements at issue had been previously rejected, and all were deemed usable. Thus,

unless the record contained evidence that the Sigstrat financial statement was unusable, which it

did not, Commerce acted in a manner consistent with its own practice by selecting the financial

statement from the primary surrogate country, notwithstanding the fact that there were two financial statements from an alternative country (*i.e.*, Thailand).

### III.   Commerce's Selection of Face Veneer Surrogate Values Is Supported by Substantial Evidence and in Accordance with Law

Although, as discussed above, the court finds that Romanian data, including Romanian HTS subheadings for face veneer inputs, supports Commerce's selection of Romania as the primary surrogate country, plaintiff argues that "[i]f the Court sustains Commerce's use of Romania as the primary surrogate country, despite superior data from Thailand, the Court should overturn Commerce's selection of face veneer [surrogate values] as unsupported by substantial evidence and contrary to law." Fine Furniture Br. 42.

### A.   Commerce's Selection and Calculation of Face Veneer Surrogate Values Properly Included End-Jointed Veneers

In its questionnaire response, Fine Furniture said it used face veneers from several different species, but did not indicate that it purchased end-jointed veneers. Plaintiff argues that Commerce's selection of Romanian face veneer surrogate values improperly included end-jointed veneers. *See* Fine Furniture Br. 42-43. In the Final Results, in order to value Fine Furniture's face veneers, Commerce first selected HTS subheadings within Romania's three main species categories for face veneers (*i.e.*, "coniferous," "tropical," and "other") relating to both (1) "Planed; sanded; end-jointed, whether or not planed or sanded" face veneers (*i.e.*, 4408.1015, 4408.3955, and 4408.9015); and (2) "Other" face veneers (*i.e.*, 4408.1098, 4408.3995, 4408.9095). *See* Final IDM at 22. Commerce then took a simple average of imports into Romania[28] under both the

---

[28]     Commerce used the average unit values from Romanian Global Trade Atlas import data to come up with this figure. *See* Final IDM at 23.

"Planed; sanded; end-jointed, whether or not planed or sanded" HTS subheadings and the "Other"

HTS subheadings.[29] Final IDM at 23.

    Fine Furniture argues that Commerce's subheading selection "improperly included imports

of face veneers that are 'end-jointed,' which is not representative of Fine Furniture's face veneer

inputs." Fine Furniture Br. 42-43 ("The requirement that Commerce use the best available

information mandates selecting the most specific product to calculate the [surrogate values] and

thus, precludes HTS [subheadings] that represent end-jointed veneers.").

    In making its argument, plaintiff insists that under the Romanian subheadings Commerce

selected, planing or sanding is optional, but end-jointing is a requirement. Fine Furniture Br. 43

("[T]he final descriptive element in the face veneer HTS [subheading] 'Planed; sanded; end-

jointed, whether or not planed or sanded,' indicates that end-jointed sheets for veneering are

explicitly *included*."). That is, plaintiff argues that the "whether or not planed or sanded" language

makes the first two descriptions ("planed; sanded") optional, but the "end-jointed" characteristic

remains the "one and only mandatory characteristic." Fine Furniture Br. 43. Therefore, plaintiff

argues that because its veneer inputs are not end-jointed, "Commerce's determination cannot be

upheld as supported by substantial evidence and must be remanded to Commerce to remove the

end-jointed HTS [subheadings] from the veneer [surrogate value] calculations." Fine Furniture Br.

43-44. Plaintiff then claims that the Thai HTS subheadings are more specific.[30]

---

[29]    As mentioned above, these subheadings varied depending on the face veneer input species (*i.e.*, coniferous, tropical, or other) and thus, the two HTS subheadings that Commerce averaged were either 4408.1015 and 4408.1098 (for "coniferous"), 4408.3955 and 4408.3995 (for "tropical"), or 4408.9015 and 4408.9095 (for "other"). *See* Final IDM at 23.

[30]    Plaintiff preferred the following Thai HTS subheadings for the various wood species:

    4408 Sheets for veneering (including those obtained by slicing laminated wood),

The court finds that the Romanian HTS data that Commerce selected to calculate the surrogate value for Fine Furniture's face veneers is supported by substantial evidence. Commerce's reading of the descriptive clause ("Planed; sanded; end-jointed, whether or not planed or sanded") is correct. *See* Final IDM at 23 ("We find that 'whether planed or sanded' refers only to 'end-jointed' because of the separation with a comma and not a semi-colon."). That is, although the Romanian HTS subheading includes end-jointed veneers, it also includes planed or sanded face veneers of the types used by the Fine Furniture in its production process, and the court does not read this description as making end-jointed veneers a "mandatory" characteristic because, as noted by Commerce, the description is separated by a comma rather than a semicolon. Indeed, plaintiff's reading of the HTS subheading would render superfluous the need to describe the first two characteristics ("planed; sanded").[31] Accordingly, Commerce's selection of the HTS subheading

---

for plywood or for similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm:

4408 10 – Coniferous:
4408.10.10.000 - - Cedar wood stats of a kind used for pencil manufactur[e], radiate pinewood of a kind used for blockboard manufacture
4408.10.30.000 - - Face Veneer Sheets
4408.10.90.000 – Other

4408.31 – Of tropical wood specified in subheading note 2 to this chapter:
440831.00.000 - - Dark Meranti, Light Red Meranti and Meranti Bakau
4408.39 - - Other
4408.39.10.000 - - - Jelutong wood slats of a kin[d] used for pencil manufacture
4408.39.90.000 - - - Other

4408 90 – Other:
4408.90.00.010 - - Teak Veneer
4408.90.00.090 - - Other

Fine Furniture Case Br. 23 (citation omitted).

[31]    Thus, as noted in the Final Results, the subheading could include any of the

to value Fine Furniture's face veneers is sustained.

**B.  Commerce Properly Used a Simple Average When Calculating Fine Furniture's Face Veneer Surrogate Values**

Plaintiff next argues that "[i]f the Court sustains Commerce's use of the end-jointed veneers . . . , the Court should overturn Commerce's use of a simple average to calculate Fine Furniture's face veneer [surrogate values]." Fine Furniture Br. 44. For plaintiff, Commerce should not have used a simple average of the import data from the two HTS subheadings,[32] but should have used a weighted average of the two categories. Fine Furniture Br. 46 ("Taking a weighted average based on the import data quantities will more accurately estimate the true commercial reality in Romania for these imports."). Plaintiff attempts to support its position by noting that Commerce has used the weight-averaging method in "numerous past determinations" under similar circumstances. Fine Furniture Br. 44 (citing *Xanthan Gum from the People's Rep. of China*, 80 Fed. Reg. 29,615 (Dep't Commerce May 22, 2015)). Moreover, plaintiff claims that a weighted average would limit the "distortive effect of including . . . a high-cost input that Fine Furniture did not consume." Fine Furniture Br. 5; *see also* Fine Furniture Reply Br. 22 ("[B]y using a simple average, the Department is giving equal importance to each specific tariff classification, which accords disproportionately higher weight to the data under the HTS heading reporting a lesser

---

following veneer types:

   (1) only planed; (2) only sanded; (3) both planed and sanded; (4) only end-jointed;
   (5) both planed and end-jointed; (6) both sanded and end-jointed; and finally,
   (7) planed, sanded, and end-jointed.

Final IDM at 22-23.

   [32]    That is, depending on input species, a simple average of the Romanian Global Trade Atlas import data for the relevant "Planed; sanded; end-jointed, whether or not planed or sanded" category (either 4408.1015, 4408.3955, or 4408.9015) and the corresponding "Other" category (either 4408.1098, 4408.3995, or 4408.9095).

quantity of imports."). Accordingly, plaintiff asks the court to remand to Commerce with instructions to "use a weighted average of data reported under the two relevant HTS codes" to calculate Fine Furniture's face veneer surrogate values. Fine Furniture Br. 46.

Commerce's application of a simple average to calculate the surrogate value for Fine Furniture's face veneers is in accordance with law and supported by substantial evidence. Commerce is "required to 'articulate in what way the surrogate value chosen relates to the factor input.'" *Gleason Indus. Prods., Inc. v. United States*, 32 CIT 382, 388, 559 F. Supp. 2d 1364, 1369 (2008) (quoting *Dorbest*, 30 CIT at 1725, 462 F. Supp. 2d at 1308). Here, plaintiff does not argue that a weighted average would better represent Fine Furniture's actual use of particular veneers. Rather, plaintiff would have Commerce use a method that would more closely approximate the "actual commercial sales happening in Romania." Fine Furniture Reply Br. 21. As Commerce stated, however, the "quantities used in calculation of the [average unit values] based on the Romanian import statistics have no relation to Fine Furniture's own consumption," and therefore a "weight-averaged [Global Trade Atlas]-based [surrogate value] is not a match to Fine Furniture's purchasing experience." Final IDM at 23 & n.64. Thus, without any evidence tending to support the argument that Fine Furniture's purchasing history is similar to the import data on the record for Romania, Commerce reasonably determined that a simple average was the better calculation method because "the record does not inform [it] where Fine Furniture's inputs precisely fit" within the two selected HTS subheadings. Final IDM at 23.

## IV.   Commerce's Separate Rate Method Is Supported by Substantial Evidence and in Accordance with Law

Finally, Old Master argues that Commerce's determination of the assessment rate for

unexamined separate rate respondents[33] is both unlawful and unsupported by substantial evidence

because Commerce assigned "an assessment rate three to five times the deposit rate without any

evidence that the dumping of that material had grown more severe." Old Master Br. 5. According

to Old Master, Commerce's use of the method set out in 19 U.S.C. § 1673d(c)(5) (which is

normally used to determine the all-others rate in market economy investigations) was "plainly

unreasonable here" because the "result reflected not an average result, but analysis of a single

company," Fine Furniture, "whose 17.37% result was assigned to all [unexamined separate rate

companies]." Old Master Br. 6. As such, Old Master claims that there was no representative sample

of exporter pricing behavior, and that Commerce "could have dealt with [the unexamined separate

rate respondents] by other reasonable means." Old Master Br. 6 (citations omitted). Ultimately,

Old Master contends that Commerce's determination "announced an assessment rate that was not

'logically connected' to the 'commercial reality' of the [separate rate] companies." Old Master

Br. 6.

        The court finds that Commerce's assignment of the 17.37 percent margin calculated for

Fine Furniture to the unexamined separate rate respondents was both lawful and supported by

substantial evidence. Subsection 1673d(c)(5) provides that "the estimated all-others rate shall be

an amount equal to the weighted average of the estimated weighted average dumping margins

established for exporters and producers individually investigated, excluding any zero and de

minimis margins . . . ." 19 U.S.C. § 1673d(c)(5)(A). Here, Commerce followed its statutorily

directed approach to assigning separate rates in nonmarket economy reviews by calculating the

---

[33]        Old Master's brief actually refers to the Department's assignment of an assessment
rate to "Section A material." Based on the context of Old Master's arguments, as well as its
administrative case brief, the court considers these arguments to be challenging the Department's
separate rate method.

separate rate using the "all-others" method from § 1673d(c)(5). *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1351 (Fed. Cir. 2016) (citation omitted) ("Under the statute, Commerce normally calculates the separate rate by averaging the 'dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins."); *see also id.* at 1352 ("[T]he statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations." (citing 19 U.S.C. § 1675(a)); *see also Mid Continent Steel & Wire, Inc. v. United States*, 42 CIT __, __, Slip Op. 18-73 at 10 (June 19, 2018). Applying that framework, Commerce's separate rate of 17.37 percent was reasonable because it was the only rate calculated for an individually investigated respondent (Fine Furniture) that was not zero, *de minimis*, or based entirely on facts available, and generally, mandatory respondents are "representative [of the market] at the very least in terms of aggregate volume." *Albemarle*, 821 F.3d at 1353; *see also Nat'l Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548, 559, 779 F. Supp. 1364, 1373 (1991) (citation omitted) ("The representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."). Therefore, Commerce followed the statute, which, it is worth noting, leaves little room for discretion.

Furthermore, although the assessment rate for Old Master's entries exceeds the amounts deposited as estimated duties, cash deposits are estimates derived from a different time period (here, the period of investigation), whereas Commerce's assessment rate reflects actual duty liabilities based on the examination of contemporaneous pricing data for the mandatory respondents. *See* 19 C.F.R. § 351.212(a); *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1343 (Fed. Cir. 2016) (citation omitted) (finding that although commercial reality is a

"reliable guidepost[] for Commerce's determinations," that term "must be considered against what the antidumping statutory scheme demands."). It is difficult to see how following the statute and using a result derived from contemporaneous information could be found unreasonable.


## CONCLUSION

For the foregoing reasons, the court sustains Commerce's Final Results. Judgment shall be entered accordingly.


/s/ Richard K. Eaton
Richard K. Eaton, Judge


Dated:  November 26, 2018
          New York, New York